Filed 7/11/16  P. v. Tovar CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067549 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD245132) |
| GERARDO ANDRE TOVAR, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Jeffrey F. Fraser, Judge.  Affirmed.

Christian C. Buckley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, Brendon W. Marshall and Samantha Begovich, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Gerardo Andre Tovar and codefendant Frederick Jocobo[1] were charged by amended information with one count of murder (Pen. Code,[2] § 187, subd. (a)). The amended information further alleged defendant Tovar personally used a firearm to inflict great bodily injury (§§ 12022.5, subd. (a), 12022.53, subds. (d) & (e)(1)), committed the murder for the benefit of, at the direction of, or in association with a criminal street gang (§ 184.22, subd. (b)(4)) and had served two prior prison terms (§§ 667.5, subd. (b), 668).

A jury convicted defendant of first degree premeditated murder and found the above enhancements true. After finding the prior prison allegations true, the court sentenced defendant to prison for an indeterminate term of 50 years to life plus a two-year determinate term.

Defendant contends the court erred when it ruled to admit the victim's sister's in-court preliminary hearing identification of defendant as the shooter. He also contends the court erred when it denied his motions to sever, dismiss and for a mistrial, and when it instructed the jury on voluntary intoxication. Affirmed.

FACTUAL OVERVIEW

Andrew Clayton testified that in May 2007, he and Raymond Gaxiola were both aspiring members of the criminal street gang National City Block Boys (NCBB). Clayton, then 16 years old, went by the moniker "Soldier" and Gaxiola by the moniker "Little Smurf." Gaxiola's other brother was Jocobo, who was also a member of NCBB.

---

[1]     Jocobo was acquitted by the jury.

[2]     All further statutory references are to the Penal Code unless otherwise noted.

In the evening on May 9, 2007, Clayton and Gaxiola drove a tan Blazer owned by Clayton's uncle to a park in National City in order to "hang[] out."  While at the park, they encountered defendant, who was then a documented member of the National City Loco (NCL) criminal street gang and who went by the moniker "Flaco."  Clayton testified that NCBB and NCL were aligned, as they both are from the "East Side" of National City.  Before that day, Clayton had never met defendant.  Gaxiola knew defendant through his older brother Jocobo.  Defendant was about five or six years older than Clayton and Gaxiola.  Later, all three went in the Blazer to pick up Jocobo.

Clayton testified that, after they picked up Jocobo, defendant wanted to be driven to an apartment on 24th Street in order to pick up a shotgun.  Defendant went inside and returned a few minutes later with a "big blue bag."  Through the car's rearview mirror, Clayton saw defendant unzip the blue bag and take out a shotgun.  Clayton said they all discussed going into a rival gang's territory to look for rival gang members.  They decided as a group to go to Shelltown, where there was a criminal street gang that was a rival of both NCBB and NCL.

While on their way to Shelltown, they came upon a construction site.  Because they could not tell whether the "safety" was on, defendant fired the shotgun out of the passenger car's window.  According to Clayton, people started running when they heard the blast.

Witness Hakim Khalfani testified he was working security at a construction site in National City on the evening of May 9, 2007.  As he and others were standing near a

3

construction fence, Khalfani saw a car come around the corner, stop and saw a person in the passenger seat stick a shotgun out the window. Khalfani next heard a single shotgun blast. In response, Khalfani and others ran. As the vehicle drove slowly by, Khalfani noted the description of the vehicle and its license plate number. Khalfani contacted National City Police.

Clayton testified that once they arrived in Shelltown, they drove down a street and passed two young Hispanic males who were standing near a white car. Because they looked like potential gang members, Clayton made a U-turn and pulled up on the two males so that the passenger door where defendant was seated was facing them. Defendant stated, " 'Where are you Pacos from?' " One of the two males raised his hand as if he was "throwing something," and said " 'Shelltown.' " Clayton testified that defendant in response said, " 'Is that right?' " Defendant next got out of the Blazer and shot one of the two males at close range. They all fled in the Blazer.

Witness Mariano Rivera testified he was with 15-year-old victim Ricardo Perez on the night Perez was murdered. Rivera testified he and Perez were "just chilling" outside of Perez's house that evening along with some other school friends. At some point in the evening, Perez crossed the street from his house to return some tools to a neighbor. Rivera testified that at that moment, a brown SUV Blazer pulled up, stopped next to Perez and a man Rivera described as tall, bald and Hispanic exited the passenger door behind the driver, walked up to Perez and shot him with a shotgun. Rivera testified that he was about 15 feet away from Perez when Perez was shot and that the man who shot

4

Perez was wearing a white shirt and brown pants. According to Rivera, before the man shot Perez he asked them, " 'Where you from?' "

Witness Emily Castaneda testified Perez was her older brother. About 8:00 p.m. on the day of the murder, Castaneda testified she was returning from school with her then stepmother. Castaneda was 14 years old at the time. As they approached their home, her stepmother stopped the car, told Castaneda to "duck down" and exclaimed, " 'Oh Shit.' " Castaneda testified she saw a small SUV she described as an "Explorer" or "Trail Blazer" stopped in front of a neighbor's house, near her house. Although her stepmother told her to duck, Castaneda "peeked through the corner of her eye" and saw "people, a car, [her] brother" and "movements."

As discussed *post*, Castaneda identified defendant as the shooter both at trial and at the preliminary hearing. Castaneda testified she saw a man she later identified as defendant exit from the passenger door on the driver's side. Next, she saw her brother make "hand movements" and exchange some words with the man, then she heard the gunshot but did not see the shooting.

After the shooting, the group went back to National City in the Blazer. On the way, they stopped at a liquor store. Defendant and Jocobo went into the store while Clayton stood watch. Defendant took a bottle of alcohol, punched the store clerk in the face and they all left in the Blazer.

After abandoning the Blazer later that evening, Jocobo asked Clayton if he wanted to fire the shotgun Clayton was carrying in the blue bag. Clayton agreed and fired the

5

shotgun into a "little tunnel area." As they continued walking, Clayton testified they heard a siren and saw flashing lights from a police car. As a result, they all ran in different directions. Clayton at the time was still carrying the shotgun. Clayton testified he jumped a fence and then ditched the shotgun in some bushes. Clayton called his uncle who picked him up and took him home.

The next day, police arrested Clayton after determining his uncle owned the Blazer. Clayton's mother and uncle were present at the stationhouse interview. The interview was videotaped and played for the jury. During the interview, Clayton admitted he was driving the Blazer the night before but refused to identify the others who were in the car. Clayton denied knowing anything about the murder. The record shows after the detectives left the room, Clayton steadfastly refused to identify who was in the Blazer with him the night before, despite myriad attempts to convince him otherwise by his mother and uncle. At the conclusion of the interview, the detectives released Clayton to his mother.

In July 2012, Clayton again was arrested and this time was charged with the murder of Perez. Between 2007 and 2012, however, Clayton had a child with his girlfriend, whom he married. At some point during this period of time, Clayton backed away from NCBB, as he wanted to go to school and he was working.

A few months after his arrest, Clayton decided to at least consider cooperating with police, inasmuch as he was the only one charged with the murder and he was no longer interested in being a member of NCBB. Clayton agreed to a " 'free talk,' " in

6

which he could tell his side of the story and learn his options, if any, with the understanding that what he said could not be used against him. The record shows the lengthy video of the "free talk" was played for the jury.

During the "free talk," Clayton, accompanied by his lawyers, told detectives that he drove defendant, Gaxiola and Jocobo to Shelltown in his uncle's Blazer, after they stopped at an apartment so defendant could pick up his shotgun. Clayton told detectives they went to Shelltown looking for rival gang members in order to put in work for the gang.

After turning down a street in Shelltown, they make a U-turn and pulled up on two individuals. Defendant next asked, "where you from?" When one of the individuals responded "Shelltown," Clayton told detectives that defendant jumped out of the passenger door on the driver's side of the car, shot one of the individuals and they left. On questioning, Clayton confirmed he was 100 percent certain that defendant murdered Perez.

Although Clayton knew he would be deemed a "snitch" and was worried about "getting [his] head blown off" as a result, he testified he decided to cooperate with the District Attorney's Office. Clayton decided to cooperate because he wanted to do the "right thing" and get "this weight off [his] shoulders." In return for his truthful testimony, the cooperation agreement provided Clayton would plead guilty to voluntary manslaughter (§ 192, subd. (a)) and the gang enhancement (§ 186.22, subd. (b)(1)), with

7

the remaining charges stricken. When he testified at defendant's trial, Clayton had not been sentenced, but was facing a three to 11-year prison sentence.

Clayton's aunt, Adriana Buelna, testified that shortly after Clayton was arrested in 2012, three individuals pulled up to her mother's house in two separate cars and asked about Clayton. One of the individuals identified himself as "Flaco." Specifically, they told Buelna they were friends of Clayton and they wanted to know how he was doing in custody. After giving Buelna a referral to a bail bondsman, they asked if there was anything they could do to help out Clayton's family.

Buelna testified that all three individuals also "were very concerned about" Clayton's "discovery" in connection with the case and inquired whether the family had received it. When the individuals mentioned "discovery," Buelna assumed they were asking about the evidence in her nephew's case. Buelna testified she would not have given the individuals the discovery even if the family had received it. Before the individuals left, defendant and Buelna exchanged telephone numbers. Police subsequently obtained the subscriber information using the phone number defendant had given Buelna and determined the phone was registered to defendant's sister.

Buelna testified defendant came by her mother's house a second time in August 2012. Defendant again inquired if the family had received Clayton's discovery.

The record shows in early December 2012, Clayton saw defendant in his jail module after defendant was arrested on a charge unrelated to the murder. Although Clayton already had signed the cooperation agreement, he had yet to be moved into

8

protective custody. As a result, Clayton "acted the usual, normal" and gave defendant some coffee, soup and a burrito. Clayton testified they spoke briefly, including about his case.

The record includes a jailhouse call made by defendant. In that call, defendant identified himself as "Flaco" to an unknown female. During the call, defendant stated that he "felt bad" for the person who gave him some soup, which was later determined to be Clayton. Defendant also stated, "I was like damn fool, I would hate me if I was him, you know what I'm saying. [¶] . . . I wouldn't even talk to me if I was him, you know what I'm saying, you know what I'm talking about? [¶] . . . I wouldn't like. I would be mad at the world if I was him, you know what I'm saying."

DISCUSSION

I.

*Admission of Castaneda's In-Court Preliminary Hearing Identification of Defendant*

A. Additional Background

Pretrial, defendant moved to exclude Castaneda's identification of defendant as her brother's shooter. The record shows Castaneda was interviewed at the time of the shooting incident. Although she gave police a description of the getaway vehicle, she gave no description of any shooter or suspects. In June 2012, Castaneda was contacted by a detective, who sought a picture of Perez for a "Crime Stopper's" poster. Castaneda told the detective that she was at the scene of the crime and "saw the person who murdered her brother." Because the detective believed any identification information

9

would already be in the police reports, he did not follow up with Castaneda until after he realized there had been no follow-up interview of her.

On November 20, 2012, this same detective reinterviewed Castaneda, who reiterated she would recognize the suspect if she saw him again. Nonetheless, no identification procedures were done despite the fact defendant, Jocobo, Clayton and Gaxiola had been charged for the murder.

Castaneda attended part of the first day of the preliminary hearing. During the morning recess, she alerted the prosecutor that she recognized defendant as the man who murdered her brother. Defendant at the time was in "jail blues, sitting at the defendant's table and was sitting at a right angle to the court due to the nature of the table configuration."

That same day, Castaneda was interviewed by a District Attorney investigator. She told the investigator that as she was being dropped off at home, she saw defendant and another person get out of a car and get in an argument with her brother; that the argument turned physical when defendant and her brother began to struggle; and that she then heard a gunshot. A few days later, Castaneda testified at defendant's preliminary hearing.

Briefly, in her preliminary hearing testimony, Castaneda stated that she was about 30 feet away from her brother when the shooting occurred; that she saw someone get out of a vehicle she described looked like a "Trail Blazer" and exchange words with her brother; that she got a "good look" at the shooter; and that the shooter was "average size,"

10

"Hispanic" and had "short hair and a mustache." Castaneda next identified defendant as the shooter, noting she was "a hundred percent sure." The record shows she was extensively cross-examined at the preliminary hearing.

In moving pretrial to exclude Castaneda's in-court preliminary hearing identification of defendant, the defense argued her observations at the scene of the murder "were quite different from other witnesses," inasmuch as she was the only witness who saw two people get out of the Blazer and she was the only one who claimed there had been a struggle between her brother and defendant. Because of the circumstances of Castaneda's preliminary hearing identification -- including that Castaneda had not told police when first interviewed she could identify the shooter and that defendant was in shackles and was in court because of the murder, the defense argued her identification of defendant as the shooter was impermissibly suggestive and should be excluded.

The record shows at the hearing on this issue, the prosecution argued Castaneda indicated to a detective in November 2012 -- before defendant was arrested for the murder -- that she could identify the shooter. The prosecution further noted that Castaneda had voluntarily come to the preliminary hearing without the request of the People; that she heard the testimony of a medical examiner and perhaps of an officer who was involved in the investigation of the alcohol stolen from the liquor store; that she did not hear Clayton's testimony or any evidence regarding the identity of the shooter; that at around 10:50 a.m., she approached the prosecution and stated she recognized defendant as the shooter; that when she was first interviewed immediately after the shooting, she

11

was traumatized after seeing her brother murdered; and that her identification of defendant as the shooter was "happenstance."

The record shows the court took the matter under submission, noting it wanted to read the preliminary hearing transcript before ruling on the issue. The court subsequently denied the defense's motion to exclude Castaneda's in-court preliminary hearing identification of defendant as the shooter. In so doing, the court noted that it was up to the jury to decide whether her identification of defendant was unreliable; that it was not uncommon for witnesses to come to court and make an in-court identification without previously identifying a defendant; that there was no misconduct by the police or the District Attorney's office in connection with her in-court identification; and that she indicated to police about a year before the preliminary hearing that she could identify the shooter, but police did not follow up with her.

B. Guiding Principles and Analysis

" ' "In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the

12

identification." [Citation.] "We review deferentially the trial court's findings of historical fact, especially those that turn on credibility determinations, but we independently review the trial court's ruling regarding whether, under those facts, a pretrial identification procedure was unduly suggestive." [Citation.] "Only if the challenged identification procedure is unnecessarily suggestive is it necessary to determine the reliability of the resulting identification." [Citation.]' (*People v. Alexander* (2010) 49 Cal.4th 846, 901–902; see *People v. Cunningham* (2001) 25 Cal.4th 926, 989–990; *Simmons v. United States* (1968) 390 U.S. 377, 384 [even if a witness has been subjected to a suggestive pretrial identification procedure, 'eyewitness identification at trial . . . will be set aside on that ground only if the [pretrial] identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification'].) In addition, the United States Supreme Court recently clarified that the federal Constitution's due process clause is not implicated when the circumstances asserted as creating an improperly suggestive identification procedure were not arranged by law enforcement officers. (*Perry v. New Hampshire* (2012) 565 U.S.[ ___, ___ [181 L.Ed.2d 694, 132 S.Ct. 716, 721] (*Perry*) [the application of the due process clause 'turn[s] on the presence of state action and aim[s] to deter police from rigging identification procedures'].)" (*People v. Thomas* (2012) 54 Cal.4th 908, 930-931.)

Here, we independently conclude Castaneda's initial in-court identification of defendant at the preliminary hearing was *not* the result of any "state action" or efforts by law enforcement to "rig[]" an identification procedure. (See *Perry*, *supra*, 565 U.S. at p.

___ [132 S.Ct. at p. 721].)  Rather, the record shows that Castaneda voluntarily attended the preliminary hearing with her mother; that the prosecution did not ask her to attend that hearing; and that when Castaneda approached the prosecutor during a mid-morning break and informed him that she recognized defendant as the shooter, the prosecutor did not even know who she was because of the time that had passed since her brother's murder.  Because there was no state action involved in arranging Castaneda's in-court preliminary hearing identification of defendant as the shooter, we reject his due process challenge to that identification.  (See *Ibid*.)

We also reject defendant's due process challenge because under the totality of the circumstances there was not a " ' "very substantial likelihood of irreparable misidentification," ' " and, thus, the issue of the reliability of her identification was for the jury to decide.  (See *People v. Arias* (1996) 13 Cal.4th 92, 168 [noting even "[w]hen an eyewitness has been subjected to undue suggestion, the factfinder must nonetheless be allowed to hear and evaluate his [or her] identification testimony unless the ' " 'totality of the circumstances' " ' suggests ' "a very substantial likelihood of irreparable misidentification" ' "], quoting *Manson v. Brathwaite* (1977) 432 U.S. 98, 106 (*Manson*).)

Here, the record shows that Castaneda was about 30 feet away from her brother at the time he was murdered; that she saw a vehicle similar to a "Trail Blazer" stop by her brother; that she got a "good look" at the man who was having words her brother; that she was 100 percent certain that man was defendant; and that *before* defendant was arrested for the murder, she told law enforcement that she could identify the man who shot her

14

brother. That Castaneda gave details about the shooting that varied in some measure from other witnesses' testimony went to the issue of the reliability of her identification of defendant as the shooter, a matter for the trier of fact.

Indeed, we note from the record that during closing argument, defense counsel of defendant spent considerable time attacking Castaneda's credibility. Defense counsel noted that when Castaneda was first interviewed by police, she did not say she could identify the shooter; that she only identified defendant as the shooter after she attended the preliminary hearing and saw him in "chains in custody"; that when she attended the preliminary hearing, she knew her brother's shooter was "on trial and his court case [was] up"; and that her testimony was based on observations "through the side of her eye," while she was ducked down in her stepmother's car, and thus were unreliable.

Finally, we reject defendant's due process challenge because we conclude even if it was error to admit Castaneda's in-court preliminary hearing identification of defendant as the shooter, that error was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).) Indeed, there is overwhelming *other* evidence of guilt in the record, as demonstrated by Clayton's testimony summarized in detail *ante* in which he stated he was 100 percent certain that defendant shot Perez. In addition, the recorded jailhouse call between defendant and an unidentified female, and the inferences to be drawn from defendant's statements, also supports this finding. Thus, there is no reasonable likelihood that Castaneda's identification of defendant as the

15

shooter prejudiced him or resulted in a substantial likelihood of irreparable misidentification. (See *Manson*, *supra*, 432 U.S. at p. 107.)

Apart from any constitutional violation, defendant contends the court abused its discretion and thus erred when it ruled to admit under Evidence Code section 352 Castaneda's identification testimony. We disagree, and conclude the court did not act in an arbitrary or capricious manner in so ruling. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1125.) In any event, given our conclusion *ante* that any error in admitting this identification testimony was harmless beyond a reasonable doubt, we reject this contention. (See *Chapman*, *supra*, 386 U.S. at p. 24.)

II.

*Severance*

A. <u>Additional Background</u>

The record shows defense counsel of both defendant and Jocobo moved pretrial to sever their joint trial. Both argued that, because several of the witnesses placed only three people in the car, in contrast to Clayton's statements that there were four in the car, defendant and Jocobo would then be in the position of pointing the "finger" at each other, creating "conflicting defenses" as a result of there being essentially "two prosecutors" in the case.

The court denied the severance motion. In so doing, the court noted:

"The thing is everybody says -- first of all, we don't know if there's going to be conflicting defenses. Let's say one of them get up there and testifies I wasn't there. [¶]

16

Well, if he wasn't there, then he can't say the other guy is there. He doesn't know. He could say I was there, and he was there, but the bottom line here is we're -- one, we're speculating again. If there is conflicting defenses, it doesn't require that we have different trials unless it's so prejudicial that the defendants couldn't get a fair trial. And by that we mean is there evidence -- sufficient independent evidence of guilt as to each. If there is, then you don't need a severance."

During a subsequent pretrial hearing, defense counsel of defendant stated her co-counsel had provided an eight-page statement from Gaxiola, who already had pleaded guilty in connection with the shooting. As a result of this statement, defense counsel of defendant argued that *if* Gaxiola was to testify, he would say defendant and not his brother Jocobo was the third person in the Blazer on the night of the shooting.[3] As such, defense counsel of defendant argued this was clearly an "antagonistic defense" warranting severance.

The record shows the court took defendant's "renewed" motion to sever under submission. Before doing so, however, the court noted that just because there were potentially different defenses between codefendants or that one defendant would try and point the finger at another defendant was "not, in and of itself, enough to sever." The court also noted that in the final analysis, the issue came down to credibility. The court subsequently denied the motion.

[3] The record shows that defense counsel of defendant recognized that it was unlikely the prosecution would call Gaxiola as a witness because the prosecution clearly believed he was lying, inasmuch as Jocobo was still being prosecuted for the murder. The record further shows Gaxiola did not testify at the trial.

17

B.  Guiding Principles and Analysis

In California, there is a statutory preference for joint trials against codefendants charged with common crimes involving common events and victims, such as in the instant case.  (See § 1098; *People v. Carasi* (2008) 44 Cal.4th 1263, 1296; *People v. Hardy* (1992) 2 Cal.4th 86, 167 (*Hardy*).)  However, a " ' "court may, in its discretion, order separate trials if, among other reasons, there is an incriminating confession by one defendant that implicates a codefendant, or if the defendants will present conflicting defenses. [Citations.]  Additionally, severance may be called for when 'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.' [Citations.] [¶] We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared when the court ruled on the motion.  [Citation.]  If we conclude the trial court abused its discretion, reversal is required only if it is reasonably probable that the defendant would have obtained a more favorable result at a separate trial. [Citations.]  If the court's joinder ruling was proper when it was made, however, we may reverse a judgment only on a showing that joinder ' "resulted in 'gross unfairness' amounting to a denial of due process." ' " '  (*People v. Homick* (2012) 55 Cal.4th 816, 848.)"  (*People v. Masters* (2016) 62 Cal.4th 1019, 1048-1049.)

It is axiomatic that severance is rarely compelled merely because codefendants present antagonistic defenses.  (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 150 (*Letner and Tobin*); *People v. Coffman and Marlow* (2004) 34 Cal.4th. 1, 41 (*Coffman*

18

*and Marlow*).)  That defendants might attempt to fix blame on each other does not by itself require severance.  (*Letner and Tobin*, at p. 150.)

Our high court in *Hardy* stated:  "Although there was some evidence before the trial court that defendants would present different and possibly conflicting defenses, a joint trial under such conditions is not necessarily unfair.  [Citation.]  'Although several California decisions have stated that the existence of conflicting defenses may compel severance of codefendants' trials, *none has found an abuse of discretion or reversed a conviction on this basis.*'  [Citation.]  If the fact of conflicting or antagonistic defenses *alone* required separate trials, it would negate the legislative preference for joint trials and separate trials 'would appear to be mandatory in almost every case.' "  (*Hardy*, *supra*, 2 Cal.4th at p. 168.)

The *Hardy* court further observed that, "although it appears no California case has discussed at length what constitutes an 'antagonistic defense,' the federal courts have almost uniformly construed that doctrine very narrowly.  Thus, '[a]ntagonistic defenses do not *per se* require severance, even if the defendants are hostile or attempt to cast the blame on each other.'  [Citation.]  'Rather, to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty."  (*Hardy*, *supra*, 2 Cal.4th at p. 168.)

" 'That different defendants alleged to have been involved in the same transaction have conflicting versions of what took place, or the extent to which they participated in it,

19

vel non. is a reason for rather than *against* a joint trial.  If one is lying, it is easier for the truth to be determined if all are required to be tried together.' " (*Hardy*, *supra*, 2 Cal.4th at p. 169, fn. 19.)  Moreover, when "there exists sufficient independent evidence against the moving defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses do not compel severance.  [Citation.]" (*Coffman and Marlow*, *supra*, 34 Cal.4th. at p. 41.)

Here, the record shows there was more than sufficient independent evidence of guilt against defendant.  (See *Coffman and Marlow*, *supra*, 34 Cal.4th at p. 41.)  Indeed, Clayton specifically testified that at defendant's request, they drove to an apartment complex so that defendant could pick up his shotgun; that defendant came back from the apartment with a "big blue bag"; that defendant fired the shotgun out the back window of the Blazer after Clayton stopped the car near a construction site, while they were on their way to Shelltown to look for rival gang members; that other witnesses at the construction site saw a person in the passenger seat stick a shotgun out the open window and heard a single blast; that after they crossed into rival gang territory, they came upon the victim, who was standing near another individual; that after Clayton stopped the Blazer, defendant asked the individuals, "Where are you Pacos from?"; and that when one of them said, "Shelltown," defendant got out of the Blazer and fired the shotgun, killing the victim.

But there's more.  Castaneda's testimony corroborated that of Clayton when she too identified defendant as the shooter.  In addition, witness Rivera, who was standing

20

about 15 feet away from Perez at the time of the murder, testified a tall, bald Hispanic male wearing a white shirt and brown pants exited a brown SUV Blazer, after asking them "Where you from?" walked up to Perez and shot him with a shotgun.  Rivera's testimony thus also corroborated Clayton's testimony in many respects.

Other independent evidence -- including the inferences to be drawn from such evidence -- supporting defendant's guilt included his visits to Buelna's mother's house, after Clayton's arrest for murder, when he asked about Clayton's "discovery" and the jailhouse call between defendant and the unknown female.  In that call, defendant stated among other things that he "felt bad" for the person who gave him some "soup" and that "I would hate me if I was him."  The record shows this call took place after Clayton and defendant met up in jail, when defendant was arrested on charges unrelated to the murder, and after Clayton gave defendant some coffee, a burrito and *soup*.

On this record, we thus conclude the court did not abuse its discretion when it denied defendant's motion(s) to sever.

III.

*Precharging Delay*

Before trial (and after seeking about a three-month trial continuance), defendant filed a motion to dismiss, contending he had been severely prejudiced as a result of the five-year delay between the murder and the filing of criminal charges against him. Defendant further contended there was no justification for the delay and there was no new evidence.

"An unreasonable delay between the time an offense is committed and an accusatory pleading is filed may violate a defendant's right to a fair trial and due process of law under article I, section 15, of the California Constitution and the Fifth and Fourteenth Amendments to the United States Constitution.  [Citation.]  In evaluating a claim of precomplaint delay, 'any prejudice to the defendant resulting from the delay must be weighed against justification for the delay.'  [Citation.]  'In the balancing process, the defendant has the *initial* burden of showing some prejudice before the prosecution is required to offer any reason for the delay [citations].  The showing of prejudice requires some evidence and cannot be presumed.  [Citations.]'  [Citations.]  Prejudice may be shown by loss of material witnesses due to lapse of time [citation] or loss of evidence because of fading memory attributable to the delay.  [Citation.]"  (*People v. Morris* (1988) 46 Cal.3d 1, 37, disapproved on another ground as stated in *In re Sassounian* (1995) 9 Cal.4th 535, 543, fn. 5.)

The record shows at the hearing on defendant's motion to dismiss, the prosecution contended that it was only *after* Clayton's "free talk" in late November 2012 that the District Attorney had sufficient evidence to charge defendant with murder. The prosecution further noted that between May 2007 (i.e., when Perez was murdered) and July 2012 (i.e., when Clayton was arrested *and* charged with the murder), police were investigating the crime, including analyzing DNA and fingerprints from the Blazer. However, there was very little information pointing to defendant's (and Jocobo's) involvement in the murder. According to the prosecution, all they had against defendant was the liquor store surveillance video, where the robbery took place.

The prosecution noted a fingerprint analysis report from December 2007 indicated that Clayton's prints were found in or on the Blazer, but that the remaining prints lifted from the car could not be analyzed due to insufficient ridge detail. Later, after defendant was arrested, a second fingerprint analysis was conducted. The examiner who conducted the second analysis determined that "technical errors had been committed" by the previous print examiner in 2007. According to the prosecution, when prints lifted from the Blazer were reexamined they matched defendant's prints taken during his December 2012 booking.

The record shows the court found that, for constitutional purposes, defendant was not prejudiced by the delay and that in any event, the People's justification for the delay was valid because they did not have enough evidence to prosecute defendant before Clayton's "free talk" in November 2012.

23

We conclude the court acted well within its discretion in denying defendant's motion to dismiss.  (See *People v. Jones* (2013) 57 Cal.4th 899, 922 [noting " '[w]e review for abuse of discretion a trial court's ruling on a motion to dismiss for prejudicial prearrest delay [citation], and defer to any underlying factual findings if substantial evidence supports them [citation]' "].)  We note the lack of evidence in the record of "actual prejudice," as opposed to defendant's broad contentions he was prejudiced because of the "loss of witness memory, the inability to generate information on where they were five years earlier, the death of *potential* witnesses" among other reasons. (Italics added.)  (See *Crockett v. Superior Court* (1975) 14 Cal.3d 433, 422 [noting a "showing of actual prejudice" is required to compel dismissal of charges and further noting this showing "must be supported by particular facts and not, as in this case, by bare conclusory statements"].)

In addition, even if such "evidence" of alleged "actual prejudice" was credited, we conclude the court properly found the People were justified in delaying criminal charges against defendant until *after* Clayton provided details about the murder during his "free talk" in late November 2012.  Until then, the record supports the court's finding that the People did not have enough evidence to charge defendant (or Jocobo) with murder, in contrast to the evidence they possessed in connection with the liquor store robbery.

## IV.

*Denial of Defendant's Motion for Mistrial*

Defendant next contends the court erred in denying his motion for mistrial because his opportunity to receive a fair trial was irreparably damaged.

A.  Additional Background

The record shows that while Jocobo's defense counsel was cross-examining Detective Daniel Harward, the following colloquy occurred:

"[Defense Counsel:]  We also talked about jail phone calls, correct?

"[Witness:]  Yes.

"[Defense Counsel:]  There are calls attributed to [defendant] that you have discussed in this case?

"[Witness:]  Yes.

"[Defense Counsel:]  One of them says, 'I play them.  I shoot them.  I'm good at it'?

"[Defense Counsel *of Defendant*:]  Objection, Your Honor, move to strike.

"[The Court:]  Overruled.

"[Witness:]  I recall a call like that.

"[Defense Counsel:]  There was an instance when [defendant] --

"[Defense Counsel *of Defendant*:]  Your Honor, I will object and request a side-bar.

"[The Court:]  All right. See everybody in chambers."

25

Out of the presence of the jury, the record shows the jailhouse call referred to by Jocobo's defense counsel was not yet in evidence. The court ruled it would sustain the objection by defense counsel of defendant, strike the evidence and would revisit the issue later, if necessary. The record further shows the court instructed the jury it was sustaining the objection to this particular jailhouse call and the answer was stricken.

Later that same day, again outside the presence of the jury, defendant's counsel moved for a mistrial, based on the statements " 'I play them. I shoot them.' " According to defendant's counsel, that statement was taken out of context. Defendant's counsel noted the full statement was as follows: " 'If you think this fool is grimy, he looked up to me. I'm like 50 times more grimier than him, maybe 100. So you ain't got nothing to worry about. All the chicks, all the games and all that shit, I have been through it. I played them. I shoot them. I'm good at it." Defendant's counsel noted the statement by Detective Harward about defendant "playing" and "shooting" was merely "gangster rhetoric" and was "completely inappropriate and inadmissible on many different levels."

In denying the mistrial motion, the court noted that defendant's counsel stopped this line of questioning "early"; that the objection was sustained; and that the jury was admonished. The court further noted the jury appeared to be paying attention and following the rules, noting it was a "really good group," and that jurors are instructed "all the time" not to consider statements that have been stricken.

26

B.  Guiding Principles and Analysis

A trial court should grant a motion for mistrial "only when ' "a party's chances of receiving a fair trial have been irreparably damaged" ' " (*People v. Ayala* (2000) 23 Cal.4th 225, 282 (*Ayala*)), that is, if it is "apprised of prejudice that it judges incurable by admonition or instruction" (*People v. Haskett* (1982) 30 Cal.3d 841, 854).  "Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions."  (*Ibid.*) Accordingly, we apply an abuse of discretion standard when reviewing a trial court's ruling on a motion for mistrial.  (See *People v. Valdez* (2004) 32 Cal.4th 73, 128.)

Applying these standards, we have little difficulty concluding the court properly exercised its broad discretion in denying the mistrial motion.  As it noted, defendant's counsel objected "early" on in connection with this line of questioning.  As a result, the court ended up sustaining the objection and admonishing the jury not to consider what we conclude, in any event, was an otherwise ambiguous statement about "playing" and "shooting" and being "good" at it.  (See *Ayala*, *supra*, 23 Cal.4th at p. 282.)

The record also shows the court instructed the jury with CALCRIM No. 222, which in part provides:  " During the trial, the attorneys may have objected to questions or moved to strike answers given by the witnesses.  I ruled on the objections according to the law.  If I sustained an objection, you must ignore the question.  If the witness was not permitted to answer, do not guess what the answer might have been or why I ruled as I

27

did. *If I ordered testimony stricken from the record you must disregard it and must not consider that testimony for any purpose*." (Italics added.)

Because we " 'credit jurors with intelligence and common sense' [citation] and presume they generally understand and follow instructions" (see *People v. McKinnon* (2011) 52 Cal.4th 610, 670), we conclude on this record defendant's chances of receiving a fair, as opposed to a perfect, trial were not " ' "irreparably damaged." ' " (see *Ayala*, *supra*, 23 Cal.4th at p. 282; see also *People v. Cunningham* (2001) 25 Cal.4th 926, 1009).

V.

*Instructional Error*

The record shows the court, over the prosecution's objection, agreed to give CALCRIM No. 625[4] concerning voluntary intoxication as requested by defendant. However, ostensibly by mistake the court gave CALCRIM NO. 3426.[5] Neither party objected to the use of CALCRIM No. 3426 in lieu of CALCRIM No. 625.

---

[4]    CALCRIM No. 625 provides: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill[,] [or] [the defendant acted with deliberation and premeditation[,]] [[or] the defendant was unconscious when (he/she) acted[,]] [or the defendant *<insert other specific intent required in a homicide charge or other charged offense>*.] [¶] A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] You may not consider evidence of voluntary intoxication for any other purpose."

[5]    The jury was instructed under CALCRIM No. 3426 as follows: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with a state of mind called malice aforethought, and the specific intent to promote, further, or assist in

28

In any event, although it appears the court gave the wrong instruction on voluntary intoxication, we conclude that error was harmless as it was not reasonably probable defendant would have obtained a more favorable verdict absent the alleged error. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) First, in our review of the record, particularly in connection with the closing argument of defendant's defense counsel, we note that defendant's theory of the case was that the murder of Perez was done by all three members of NCBB and *not* by defendant. Thus, it does not appear from the record that defense counsel of defendant relied on voluntarily intoxication as a theory to argue defendant was not guilty of first degree murder or a lesser included offense.

Second, we note the jury was in fact instructed that it could consider voluntary intoxication in connection with malice aforethought *and* the specific intent requirement for the gang enhancement. We further note, however, that the jury convicted defendant of both first degree murder and of the gang enhancement, both of which required a finding of specific intent. For this separate reason, we conclude any error in instructing

criminal conduct by gang members. [¶] A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] In connection with the charge of murder, the People have the burden of proving beyond a reasonable doubt that the defendant acted with the state of mind called malice aforethought. If the People have not met this burden, you must find the defendant not guilty of murder. [¶] In connection with the gang allegation, the People have the burden of proving beyond a reasonable doubt that the defendant acted with the specific intent to promote, further, or assist in criminal conduct by gang members. If the People have not met this burden, you might find this allegation not true. [¶] You may not consider evidence of voluntary intoxication for any other purpose."

29

the jury with CALCRIM 3426 in lieu of CALCRIM No. 625 was harmless.  (See *Watson*, *supra*, 46 Cal.2d at p. 836.)[6]

DISPOSITION

The judgment of conviction is affirmed.

BENKE, Acting P. J.

WE CONCUR:

McDONALD, J.

IRION, J.

---

[6] In light of our resolution of the issues in this case, we reject defendant's final contention that he was deprived of due process as a result of the cumulative effect of alleged errors. (See *People v. Williams* (2009) 170 Cal.App.4th 587, 646 [noting under the "cumulative error" doctrine, a judgment is reversed only if there is a "reasonable possibility" that the jury would have reached a result more favorable to defendant absent a combination of errors].)

30